# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10 B 19703 |
| KENNETH KO, | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| RONALD WOLTERS, | ) | |
| | ) | Adv. No. 11 A 338 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| KENNETH KO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court following trial on the complaint brought by Plaintiff Ronald Wolters against Defendant Kenneth Ko, seeking a finding that the debt Ko owes to Wolters is nondischargeable under 11 U.S.C. § 523(a)(2), and that Ko should be denied discharge of all debts pursuant to 11 U.S.C. §§ 727(a)(3) and 727(a)(4)(A). The court heard testimony from Ko, Wolters and Gregory Reynolds, and admitted numerous exhibits into evidence. At the close of the trial, the court found that Wolters had not met his burden of proving that Ko made any false representations to Wolters. Therefore, judgment is entered for Ko on the § 523(a)(2) count. The court set a briefing schedule on the § 727 counts. Wolters and Ko timely filed their post-trial briefs.

Having heard the testimony of the witnesses, read the exhibits admitted into evidence and reviewed the submitted briefs, the court also enters judgment for Ko on the counts brought under §§ 727(a)(3) and 727(a)(4)(A).

## FINDINGS OF FACT

### Kenneth Ko's Employment History and Relationship With Peter Cho

Kenneth Ko attended the University of Illinois at Champaign-Urbana, and left two credits shy of a degree in engineering with a finance minor. Tr. at 8-9.[1] He worked at John Dawson & Associates as an IT specialist from 1993 or 1994 until 1998. Tr. at 6.

One of the owners of John Dawson was Peter Cho, who is Ko's brother-in-law. Tr. at 9-10. The federal government investigated John Dawson for unauthorized trades and commingling of funds, and Cho was indicted. Tr. at 10-11. Ko was subpoenaed to appear before the Securities and Exchange Commission in 2000. Tr. at 11. He gave false testimony to the SEC investigators, and was charged with obstruction of justice and perjury. **Pl. Ex. 3**, ¶ 10. Ko eventually pled guilty to Count One of the indictment against him, that he "knowingly made false and misleading statements under oath to the staff of the SEC." **Pl. Ex. 32**, p. 2.

Ko then opened Ko Enterprises, a carwash detail center, which he operated until 2003. Tr. at 6. Following that, Ko joined Town & Country as a loan processor, where he worked for less than a year. Tr. at 7.

After leaving Town & Country, Ko worked at Pathway Financial from 2005 through spring 2008 as its office manager. Tr. at 7-8. Pathway was a mortgage broker owned by Ko's wife. Tr. at 7. Between his time at Town & Country and at Pathway, Ko was in the mortgage business for about 5 years. He is currently unemployed, and has been since Pathway closed in 2008. Tr. at 109.

Ko lives at 2643 North Greenwood in Arlington Heights. Tr. at 5. His wife purchased this property in October 2007, solely in her name. Tr. at 22. Prior to moving into 2643 North

---

[1] Tr. refers to the official transcript of the proceedings held on February 2, 2012.

Greenwood, Ko lived at 378 Daniels Court, also in Arlington Heights. He purchased it jointly with his wife in May 1996. Tr. at 22-23. Ko quitclaimed title to the Daniels Court property to his wife in June 1999, Tr. at 23, which was during the time the federal government was investigating activities at John Dawson. When asked why he quitclaimed title to his wife, Ko stated: "I'm not sure why I did it or what we did." Tr. at 23, lines 24-25.

Ko's wife is an accountant who had no prior experience in the mortgage industry before becoming Pathway's owner. Tr. at 26. She rarely visited Pathway's office in Glenview, although she kept the books and paid all of Pathway's bills. **Pl. Ex. 29**, p. 45. There were five or six employees who wrote the loans at Pathway. Tr. at 26. Ko ran the day to day operations, **Pl. Ex. 29**, p. 46, and made significantly more money from Pathway than his wife did, even though she owned the business, **id.** at p. 51. Tr. at 31-33.

Pathway needed leads in order to generate loans. Tr. at 33. A substantial number of Pathway's leads came from Peter Cho through his company IGAMIC, Inc. **Id.** Pathway stopped purchasing leads from Cho in late 2007 or early 2008. **Pl. Ex. 29**, p. 94. Pathway stopped operating when expenses exceeded income. **Id.** at p. 93. It was neither marketed nor sold as a going concern. **Id.** at p. 94.

### The "Purchase" of 6028 North Landers Avenue

On June 30, 2005, Ko purchased a single family home at 6028 North Landers Avenue in Chicago. Tr. at 16; **Pl. Ex. 14**. He made the purchase partially for an investment but mostly to help Cho, who could not obtain a loan on his own. Tr. at 17. Cho asked Ko to make the purchase and promised Ko that he would give him $5,000 or $10,000 at closing. Tr. at 17-18. Plaintiff's **Ex. 20 is** a check in the amount of $5,000 from First American Title Insurance Company made out to Ko, dated June 30, 2005.

[3]

Ko purchased the house on Landers and signed an Owner Occupancy Agreement, promising the lender that he would reside in the house. Tr. at 18; **Pl. Ex. 19**. In hindsight, Ko realizes this was a mistake. Tr. at 18. He had no intention of living at 6028 North Landers and continued to reside elsewhere.

Ko refinanced the mortgage on 6028 North Landers in February 2006 and again in October 2006. Tr. at 21. For a second and a third time, he falsely represented to the lender that he was the owner-occupier. Tr. at 21-22.

In fact, Gregory Reynolds lived at 6028 North Landers. Through his boss, Reynolds had met Cho in 2005. Tr. at 73. At that time, Reynolds felt "the wolf [was] at the door." Tr. at 80, line 16. Cho told Reynolds he could help him with interim financing to clear his debt. Reynolds was desperate, but could not get a bank loan. Tr. at 80-81.

On the same date Ko closed on 6028 North Landers, First American Title issued a check to Reynolds in the amount of $60,000. **Pl. Ex. 21**. Reynolds testified that "Peter [Cho] asked me to sign a check for $60,000, and then he gave me a check for – I then gave him a check for $60,000. . . . Peter put this in my account, and I had to give him the same amount right back that same day." Tr. at 78, lines 10-12 and 15-17. Reynolds signed several documents over different days, and is not sure what he signed. Tr. at 82, lines 22-25 ("Frankly, I was very trusting that I was finally on a good path. And, you know, I don't know what they all were. And, I mean, I am guilty of not reading every fine print. . .").

One thing was clear from Reynolds' testimony - Reynolds never entered into a contract with Ko to sell his home on Landers. Tr. at 69-70. Indeed, Reynolds was not present at the closing on June 30, 2005, and only learned of the transfer over a year later, despite the warranty deed with his signature issued on that date. Tr. at 69-72; **Pl. Ex. 24**. At the time Ko purchased

6028 North Landers, Reynolds believed he had about $180,000 in equity in the property. Tr. at 77.

Ko believed that Reynolds was a tenant, through an arrangement Cho set up, and that Reynolds made "rent" payments of approximately $1,000 per month. Tr. at 35-37. According to Ko, "I didn't know the arrangement about the lease and all those things because I said Peter [Cho] took care of all of those things." Tr. 37, line 25 – 38, line 3.

Reynolds, on the other hand, believed these "rent" payments went toward paying off Cho's loan to him, Tr. at 79-80, a loan apparently made possible by liquidating Reynolds' equity without his knowledge. Reynolds made payments to Cho (and sometimes to William Jennings, a Pathway employee) every month in fluctuating amounts, Tr. at 84-85, but believed that he always owned the house on Landers. Ko's monthly mortgage payment on Landers was approximately $1,500, which he paid from 2005 through 2009. Tr. at 36.

Reynolds was familiar with Ko, although they never had a formal meeting and the two men had no business transactions. Tr. at 67-69. Reynolds had been working at Avondale, a roofing company. Tr. at 75. Cho encouraged Reynolds to reduce the debt by working at Pathway on prequalifying customers. Tr. at 74-75. Reynolds thought Cho was the principal at Pathway. Tr. at 75.

## Cho Meets Ronald Wolters and Obtains a "Secured" Loan From Him

Ronald Wolters, who lives at 1934 North Halsted in Chicago, was in the advertising industry before retiring. Tr. at 89. Several years ago he received a cold call from Cho, soliciting Wolters' mortgage business. Wolters and Cho became friends, and Cho eventually refinanced Wolters' mortgage. Tr. at 90.

[5]

After the successful refinance, Wolters invested in a condominium deal with Cho. The deal didn't go well, but Cho got Wolters all of his money back. Tr. at 90.

On or about August 21, 2006, Wolters loaned Cho $243,000 at 10.37% interest. Tr. at 90; **Pl. Ex. 4**. Payments on the $243,000 loan were to be interest only, with the principal due in full in August 2009. Tr. at 91. As collateral, Cho gave Wolters a quit claim deed to the property at 6028 North Landers. Tr. at 91; **Pl. Ex. 13**. Wolters received the title in the mail around Thanksgiving 2006, Tr. at 93-94, and it in fact it is dated November 21, 2006, **Pl. Ex. 13**. The deed was signed by Ko and his wife, although Wolters and Ko had no conversations about it. Tr. at 99. Wolters met Ko only one time. Tr. at 93. The two men went to lunch with Cho. Tr. at 43 and 93.

Wolters thought the quitclaim deed gave him title to the property in the event of a default. Tr. at 95. Wolters would never have given Cho the $243,000 loan if he had not received the quitclaim deed. Id. According to an appraisal Wolters received, the Landers property was valued at $380,000. Tr. at 93.

When Cho asked Ko to issue the quit claim deed, Ko was willing to do it without compensation because he never had any equity in the property. Tr. at 47. He believed his agreement with Cho "was that I was supposed to have that property for about a year or two at max." Tr. at 46, lines 11-12. Then "if it was sold and there was a profit, that he would give me something." Tr. at 49, lines 5-6.

Ko's understanding of the purpose of the quitclaim deed "was that Peter [Cho] was trying to put Ron Wolters on title so that he can actually take the home out of my name." Tr. at 46, lines 17-19. Ko had refinanced the property just a month earlier, Tr. at 103 – after Wolters signed the note with Cho - reducing the loan amount from $344,150.37 to $336,000, **Def. Ex. 9**.

[6]

Ko knew at the time he issued the quitclaim deed that Cho would be serving a prison sentence sometime in the future. Tr. at 48. Although he gave Wolters a quitclaim deed to 6028 North Landers in 2006, Ko listed the property on Schedule A of his bankruptcy petition. **Pl. Ex. 1.** Ko explained that he did so "[b]ecause I had a mortgage outstanding against it." Tr. at 57, lines 6-7.

Cho made payments of $2,100 each month on Wolters' loan to him, from September 15, 2006 through January 19, 2009, but he still owes Wolters the full principal balance. Tr. at 92. Wolters testified that approximately $75,000 in unpaid interest has accrued as well. Tr. at 93. Wolters eventually sued Cho and the Kos in state court. **Pl. Ex. 31.**

Ko had no idea Cho had borrowed money from Wolters until he was served with the state court lawsuit. Tr. at 45 and 102. As far as Ko knew, Pathway was not involved in this transaction. Tr. at 105.

### Missing Documents and Bank Accounts

During the discovery phase of this adversary proceeding, Wolters issued a request for production of documents. **Pl. Ex. 6.** Request 9 sought production of "[f]inancial statements for Pathway Financial, Inc. for 2005, 2006, 2007, 2008, and 2009." **Id.** In response, Ko stated that he "does not have these; Pathways financial, Inc. [sic] was soley [sic] owned by Mrs. Ko, the computer that she was using crashed and these statements crashed with it." **Id.**

Request 10 sought production of "[g]eneral ledger, general journal and all supporting journals reflecting accounting entries for Pathway Financial, Inc. for years 2005, 2006, 2007, 2008, and 2009." **Id.** In response, Ko stated that "[t]hese were also on quickbooks which crashed as well." **Id.**

Ko gave testimony at trial that was consistent with these responses. Tr. at 50-51. He also testified that after filing his tax returns, he shredded his paystubs. Tr. at 51. Ko further stated that he is not a good record keeper. Tr. at 49.

Pathway's 2006, 2007 and 2008 tax returns were produced to Wolters. Although the returns were dated October 11, 2010, Ko believed they were prepared prior to the Internal Revenue Service's filing deadline each year. Tr. at 53-54 and 58; **Pl. Exs. 36, 37 and 38**. The court noted during the trial that the software sometimes inserts the print date when a tax return is reprinted. Tr. at 58-59. The 2008 return is a final return.

Ko had an interest in two bank accounts which he did not list on the Schedule B that he filed in his bankruptcy case:

- Harris Bank account, which was held jointly with his wife for some period of time prior to filing the bankruptcy case. Ko took his name off this account at some point before filing for relief under Chapter 7. Tr. at 61. He did it "because I didn't want her, my wife or the family, to be affected with anything that was going on that was personally, you know, my mistake." Tr. at 62, lines 23-25. The testimony was unclear as to whether Ko meant his criminal case or this bankruptcy case. Tr. at 62-63. Ko does not remember when he took his name off the account. Tr. at 63, line 1 ("I don't know the time frame."). When asked at his deposition on November 8, 2010, how long ago he took his name off the account, Ko answered, "I don't know." **Pl. Ex. 29**, p. 82 line 21. See also id., p. 92 lines 16-17 ("Like I said before, I can't be sure. Honestly, I don't know when that was . . .").

- National City savings account. Tr. at 63. Ko is an authorized signatory on this account, into which his mother's Social Security check is deposited. Id. He takes money out of

the account each month to give to her.  "[M]y mom receives Social Security, and she's

not very good at taking care of her finances.  So what I did is I would take that money out

for her and deliver it to her."  Tr. at 63, lines 21-24.

## CONCLUSIONS OF LAW

As stated in the introduction, the court determined at the end of trial that judgment would

be entered for Ko on the dischargeability count.  Therefore, the court will analyze the evidence

only to determine whether Ko's discharge should be denied.

Wolters brought two counts seeking denial of Ko's discharge.  Objections to discharge

are construed strictly against the objecting creditor and liberally in favor of the debtor.  See In re

Kontrick, 295 F. 3rd 724, 736 (7th Cir. 2002), aff'd, Kontrick v. Ryan, 540 U.S. 443 (2004).

According to the Federal Rules of Bankruptcy Procedure, "[a]t the trial on a complaint objecting

to a discharge, the plaintiff has the burden of proving the objection."  Fed. R. Bankr. P. 4005.  In

the Seventh Circuit, the objecting creditor must establish grounds for denial of discharge by a

preponderance of the evidence.  In re Scott, 172 F. 3rd 959, 966-67 (7th Cir. 1999).

### Ko's Discharge Will Not Be Denied Pursuant to 11 U.S.C. § 727(a)(3)

Wolters first seeks denial of Ko's discharge pursuant to 11 U.S.C. § 727(a)(3):

(a)     The court shall grant the debtor a discharge, unless—

> (3)     the debtor has concealed, destroyed, mutilated, falsified, or failed to keep
> or preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case; . . .

According to the Seventh Circuit, "[t]his language places an affirmative duty on the

debtor to create books and records accurately documenting his business affairs."  Scott, 172 F.

3rd at 969 (citation omitted).  A creditor need not prove that the debtor intended to defraud it by

failing to keep or destroying books and records; "[s]ection 727(a)(3) does not require proof of

[9]

criminal or quasi-criminal conduct." Id. See also In re Juzwiak, 89 F. 3rd 424, 430 (7th Cir. 1996).

One bankruptcy court, in discussing the standards set forth by the Seventh Circuit, acknowledged that "[t]he foregoing authorities [Scott and Juzwiak] appear to establish an extraordinarily high standard for record keeping for a debtor—frankly a standard which the author's own practices would not meet were the author to have *engaged in a business enterprise* and then had to file a bankruptcy case when it failed." In re Tauber, 349 B.R. 540, 549-550 (Bankr. N.D. Ind. 2006) (emphasis in original). Therefore, concluded the Tauber court, the Circuit "clearly limited the detailed record keeping requirement imposed under 11 U.S.C. § 727(a)(3) to debtors who themselves are engaged in extensive business transactions in which all of their assets and liabilities are implicated." Id. at 552. See Scott, 172 F. 3rd at 970 ("[M]ost bankruptcies are consumer-type bankruptcies with no assets or business affairs to speak of, and, therefore, the complexity of their business transactions do not implicate § 727(a)(3). But where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping.").

Wolters argues that Ko's discharge should be denied pursuant to § 727(a)(3) for the following reasons:

- Ko testified that he is not a good record keeper;

- Ko failed to produce paystubs from his employment at Pathway and he shredded all paystubs from Pathway;

- Ko failed to produce check registers, ledgers, financial statements, or any other documentary evidence of Pathway's income or expenses because his computer crashed;

- Ko failed to produce any evidence of either Reynolds' payments or Cho's payments;

[10]

- Ko remembered no details regarding the purchase of 6028 North Landers, and Ko stated in his answers to interrogatories that there was no way to provide this information;

- Ko failed to disclose his interest in or transfer of interest in the Harris Bank account; and

- Ko failed to disclose his interest in the National City Bank account.

The court can quickly dispatch many of these arguments. First, Ko's testimony that he is not a good record keeper is nothing more than his opinion. A witness' testimony that he is a poor record keeper is not evidence that he actually failed to keep financial records.

Second, while Ko failed to produce paystubs from Pathway, he testified that he no longer has the paystubs because he shredded them after he filed his tax return. The court heard Ko's testimony on this point, and finds this particular testimony credible. It is reasonable to shred paystubs once the financial year is complete and a tax return has been filed.

Third, Ko testified that he failed to produce check registers, ledgers, financial statements, or any other documentary evidence of Pathway's income or expenses because his computer crashed. Although the court is sympathetic to Plaintiff's argument that this is the modern day version of "the dog ate my homework," after observing Ko's demeanor during this portion of his testimony, the court finds Ko's testimony on this point to be credible. Moreover, Ko did produce Pathway's tax returns.

Additionally, Pathway closed in 2008. Ko did not file this bankruptcy case until April 2010. Finally, Ko worked only as Pathway's office manager; his wife was the owner. The question at hand is whether Ko failed to maintain adequate records for himself, not for a business owned by his spouse.

As Tauber discussed above, the stringent record keeping requirements of Juzwiak and Scott do not apply to consumer debtors. Wolters argues that Ko is no run-of-the-mill consumer

[11]

debtor, having operated Pathway for several years.  He also argues that Ko was the true owner of

Pathway, not his wife, and that records for that business must therefore be available to Ko's

creditors.

The evidence adduced at trial failed to show, by a preponderance of the evidence, that Ko

was the true owner of Pathway.  Plaintiff demonstrated that Ko ran the day to day operations at

Pathway, and that Ko's wife rarely appeared in the office.  However, she kept the books and paid

the bills.  Moreover, Ko did produce corporate tax returns for Pathway, and these are "the

'quintessential documents' in a personal bankruptcy."  In re Dennis, 330 F. 3rd 696, 703 (5th Cir.

2003) (quotation omitted) (the Dennis debtor also produced "numerous bank, payroll, and other

records").

"[D]enial of discharge is a harsh remedy to be reserved for a truly pernicious debtor."  In

re Johnson, 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988).   The court is not convinced that Ko's

failure to produce business records for a business owned by his wife, and closed down

approximately two years before he filed for relief under Chapter 7, rises to the level necessary

for denial of discharge.

Fourth, Ko failed to produce any evidence of either Reynolds' "rent" payments or Cho's

payments.  However, Reynolds testified that he made payments to Cho, and sometimes to

another Pathway employee.  There would be no reason for Ko to have a record of those

payments.  It is also unclear to what Wolters is referring when he claims in his post-trial brief

that records of "Cho's payments" are missing.  Ko would have no records of Cho's payments to

Wolters on the $243,000 note.  This failure does not require denial of Ko's discharge.

Plaintiff's fifth item concerns the lack of detail regarding the purchase of and subsequent

refinancing transactions for 6028 North Landers.  The failure to maintain records regarding this

[12]

property would be troubling, except that Ko purchased the property on June 30, 2005, nearly <u>five</u>

<u>years</u> before he filed for protection under Chapter 7.  The refinancing transactions took place

shortly thereafter.  Ko issued the quitclaim deed to Wolters on November 21, 2006,

approximately <u>three and a half years</u> before he filed this bankruptcy case.  Ko's failure to keep

records of these transactions does not rise to the level required for denial of discharge.

The most troubling allegations concern Ko's failure to disclose his interest in or transfer

of interest in a Harris Bank account, and his failure to disclose an interest in a National City

Bank account.  However, even if true, these allegations are not cause for denial of discharge

under § 727(a)(3).  The court will address these allegations in the next section, which discusses

whether Ko's discharge should be denied under § 727(a)(4) for making false statements.

For all of the reasons stated above, Ko's discharge will not be denied pursuant to 11

U.S.C. § 727(a)(3).

### Ko's Discharge Will Not Be Denied Pursuant to 11 U.S.C. § 727(a)(4)(A)

Wolters also seeks denial of Ko's discharge pursuant to 11 U.S.C. § 727(a)(4)(A):

**(a)**      The court shall grant the debtor a discharge, unless—

      **(4)**      the debtor knowingly and fraudulently, in or in connection with the case--

      **(A)**      made a false oath or account; . . .

In order "to prevail on a claim under this subsection, the [plaintiff] must prove by a

preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement

was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with

fraudulent intent; and (5) the statement related materially to the bankruptcy case." <u>Stamat v.</u>

<u>Neary</u>, 635 F. 3rd 974, 978 -979 (7th Cir. 2011) (string citations omitted).

[13]

**Ko Made Statements Under Oath**

"A debtor's petition, schedules, statement of financial affairs, statements made at an 11

U.S.C. § 341 meeting, and answers to interrogatories all constitute statements under oath for

purposes of § 727(a)(4)." Fiala v. Lindemann, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007). Ko

made the following statements or omissions under oath:

- Ko omitted the transfer of his interest in the Harris Bank account from his Statement of

  Financial Affairs ("SOFA"). Question 11 on the SOFA requires a debtor to list all

  financial accounts which were closed, sold or otherwise transferred within one year

  preceding the commencement of the bankruptcy case. Ko checked "none" in answer to

  Question 11. Answering "none" was a statement under oath.

- Ko omitted his interest in the National City Bank savings account from his bankruptcy

  schedules. Schedule B requires debtors to list all "checking, savings or other financial

  accounts" in answer to Question 2. This omission is a statement under oath.

- When Ko purchased and refinanced 6028 North Landers, he completed an Owner

  Occupancy Agreement and represented to the lender that he would reside in the property

  although he never intended to do so. The court has carefully reviewed the Owner

  Occupancy Agreement, and the evidence does not demonstrate that this is a statement

  under oath. First, the copy provided to the court is not signed by Kenneth Ko. Second,

  Ko "represent[s] and warrant[s]" that the property is or will be owner-occupied, but there

  is no indication that Ko was required to declare under penalty of perjury that the

  information is true and correct, as he would have to do on a bankruptcy petition. As the

  court will discuss later, however, there are other reasons why this statement cannot

  constitute a basis for denial of discharge; therefore, the court will not make a finding as to

[14]

whether it is a statement under oath. For the purpose of discussing the other elements of this subsection, however, the court will assume this element was proved.

- Ko transferred by quitclaim deed to his wife his interest in the property he owned jointly with her at 378 Daniels Court in Arlington Heights. Question 10 on the SOFA requires a debtor to list all transfers of property made within two years before filing. Ko checked "none" in answer to Question 10. Answering "none" was a statement under oath.

- Ko testified that his wife owned Pathway. However, Ko ran the day to day affairs at Pathway, Cho provided a substantial part of Pathway's leads through IGAMIC, and Reynolds (who worked briefly at Pathway) believed that Cho owned it. Therefore, Wolters alleges that Ko had at least an equitable ownership in the business that should have been disclosed, and the failure to disclose this equitable ownership interest was a material omission from his schedules and statement of financial affairs. When asked in Question 13 on Schedule B to list all "stock and interests in incorporated and unincorporated businesses," Ko checked "none." This was a statement under oath.

**Two of the Statements Under Oath Were False**

Ko answered "none" when asked to list all financial accounts which were closed, sold or otherwise transferred within one year preceding the commencement of the bankruptcy case. Therefore, he omitted the transfer of his interest in the Harris Bank account from his Statement of Financial Affairs ("SOFA").

Although Ko admitted under oath that he took his name off the account, there is no evidence that he did so within one year before filing his bankruptcy case. When asked at his deposition on November 8, 2010, how long ago he took his name off the account, Ko answered, "I don't know." When asked again a short time later, Ko stated, "[l]ike I said before, I can't be

sure. Honestly, I don't know when that was . . ." At trial, Ko testified that he removed his name from the account "because I didn't want her, my wife or the family, to be affected with anything that was going on that was personally, you know, my mistake." The testimony was unclear as to whether Ko meant his criminal case or this bankruptcy case, even when he was asked to clarify his answer, and Ko affirmatively stated that he did not know "the time frame."

In order for Ko's omission of this transfer of his interest to be a false statement under oath, he must have made the transfer within one year prior to filing. Question 10 on the SOFA requires a debtor to list all transfers of property made within two years before filing, but Question 11 is more specific regarding financial accounts. Since no evidence was produced to support a finding that the transfer of his interest took place within one year before the bankruptcy filing, Wolters has not proven by a preponderance of the evidence that Ko made a false statement under oath when he failed to list this transfer in answer to Question 11.

Ko's omission of his interest in the National City bank account constitutes a false statement under oath. At the time he filed for relief under Chapter 7, he had an interest in the account. He was required to disclose this interest, and he did not.

Assuming that Ko's statement that he would be an owner-occupier of the Landers property was a statement under oath, it was false.

Ko answered "none" when asked to list all transfers of property made within two years before filing. Therefore, he omitted the transfer by quitclaim deed to his wife of his interest in 378 Daniels Court in Arlington Heights.

This omission was a statement under oath, but it was not a false statement. This transfer was made in 1999, which is well beyond the look-back period in Question 10. Even if it could

possibly been construed at some point in the past as a fraudulent transfer, omission of this transfer was not a false statement under oath.

Ko answered "none" when asked in Question 13 on Schedule B to list all "stock and interests in incorporated and unincorporated businesses." Although Ko's wife owned Pathway, Wolters argues that Ko had an equitable interest in the business which should have been disclosed, and therefore checking "none" in answer to Question 13 was a false statement.

Having heard the testimony presented, the court is left with the impression that Pathway's business was not entirely above board. Employees at Pathway cold-called potential customers in the hopes of drumming up mortgage business during the real estate boom of the mid-2000s. Leads were funneled to Pathway through a business named IGAMIC, about which the court learned very little except that a convicted felon named Peter Cho ran it.

From the evidence presented, however, it appears to the court that if anyone other than Ko's wife had an equitable interest in Pathway, it was the mysterious Peter Cho. Many if not most of Pathway's leads came from another Cho business, IGAMIC. Reynolds, who worked at Pathway for a short time, believed that Cho was the principal. When Pathway stopped purchasing leads from Cho in late 2007 or early 2008, it closed shortly thereafter.

Moreover, when Pathway did close its doors in 2008, it did so because expenses exceeded income. It was neither marketed nor sold as a going concern because there was nothing of value in the business. By the time Ko filed for relief under Chapter 7 on April 30, 2010, Pathway had been shuttered for over a year.

Wolters cites In re Coady, 588 F. 3rd 1312 (11th Cir. 2009), for the proposition that a debtor's discharge may be denied based on concealment of an equitable interest in a spouse's business. Coady is distinguishable on several levels. First, it was decided under § 727(a)(2)(A),

[17]

pursuant to which a debtor's discharge may be denied if "with intent to hinder, delay, or defraud

a creditor . . . [the debtor] concealed – (A) property of the debtor, within one year before the date

of the filing of the petition." The instant complaint is brought under § 727(a)(4)(A).

More importantly, the egregious facts in Coady were far different than those before the

court today. Mr. Coady

> had formerly been a successful real estate developer with a net worth of
> approximately $10 million, but an economic downturn left him $27 million in
> debt. While so indebted, Coady married, moved into his wife's house, drove a car
> leased in her name, and for over ten years worked exclusively as an
> "uncompensated independent contractor" for business entities under her sole
> ownership. He drew no salary, but his wife allowed him to write checks in her
> name on the businesses' accounts to pay personal expenses. She also paid for his
> country club and golf club memberships, the latter of which he used to promote a
> golf consulting and marketing business that she owned. Although Coady had
> neither income nor an individual bank account, in 1999 he personally executed a
> $164,000 promissory note to fund a real estate development for one of the
> businesses.

Id. at 1314 (footnote omitted explaining that Coady received $5,000 per month from one

business during one year). Furthermore, "Coady's personal use of business accounts, along with

his wife's financial support, replaced any regular compensation that might otherwise have been

available to satisfy his creditors' claims. Through this arrangement, Coady acquired and

concealed an equitable interest in his wife's businesses." Id. at 1315-16.

By contrast, Ko received a salary from Pathway. There was no evidence that he used

business accounts for personal expenses, and no evidence to support a conclusion that he

financed a lavish lifestyle through Pathway while frustrating his creditors.

Wolters also cites In re Zhang, 463 B.R. 66 (Bankr. S.D. Ohio 2012). The Zhang court

explained that "[b]ankruptcy courts, as courts of equity or otherwise using their equitable

powers, may look through the form to the substance. Thus, bankruptcy courts have applied these

same concepts [veil piercing and alter ego principles] outside the corporate fiction scenario when

[18]

debtors have placed assets under the name or custody of other people." 463 B.R. at 82. Zhang used these principles to find a prepetition scheme to conceal the debtor's income, where the evidence established that the income generated by the corporate entities owned by the debtor and his wife was primarily the result of debtor's knowledge and skills.

Although it has been less than a year since Zhang urged bankruptcy courts to use their equitable powers, more recently the Seventh Circuit discouraged its lower courts from doing so. See Sunbeam Products, Inc. v. Chicago American Manufacturing, LLC, 686 F. 3rd 372, 375-376 (7th Cir. 2012).

Moreover, even if it were appropriate to act equitably in this case, Zhang is distinguishable. The evidence in this case tended to show that the income generated by Pathway was, between Ko and his wife, primarily generated by Ko. And the amount of money they took out of Pathway reflected the inequality of their contributions. In contrast to the debtor in Zhang, Ko always earned more than his wife did from Pathway. At the end of the day, when Pathway closed, Ko's wife was left with a worthless interest in a failed company, while Ko had received several years of salary payments.

Finally, Wolters asks the court to consider In re Ogalin, 303 B.R. 552 (Bankr. D. Conn. 2004). Frank Ogalin started a drywall business. He eventually resigned as an officer of the company while his wife and daughter retained and/or took officer positions. Over the five year period preceding Frank's bankruptcy filing, the company paid $664,577.12 in salary and bonuses to Ogalin family members, and Frank Ogalin received only 9% of that amount. Indeed, his salary decreased while the company increased its reimbursement of his personal expenses. A creditor filed a 727 action, asserting that Frank structured his personal and business affairs to hide assets from his creditors. This theory was based on the belief that the drywall company

[19]

derived most of its value from Frank's work, even though it was nominally owned by his wife and daughter. The Ogalin court found that his wife Verna "orchestrat[ed] a strategy to hinder and delay the family's creditors . . . . [W]hen coupled with Frank's knowledge and acquiescence, Verna's conduct forms the basis for discharge disqualification." Id. at 561.

Plaintiff urges the court to make a similar finding in this case, asking the court to consider the lack of testimony from Ko's wife "or any other source that would tend to rebut Plaintiff's claim that her nominal ownership of the company was anything other than an attempt to divert resources away from Ko's creditors." Post-trial brief at 6. Plaintiff may have made this claim, but it was not supported by the evidence adduced at trial, certainly by nothing approaching the evidence recited in Ogalin. Moreover, as mentioned above, Ko's wife might have been the nominal owner of Pathway, but Ko did most of the income-generating work and was appropriately compensated, unlike Frank Ogalin.

The facts before the court today do not convince the court that the plaintiff has demonstrated, by a preponderance of the evidence, that Ko held an equitable interest in Pathway. Neither is the court convinced that the non-binding precedent Wolters cited compels a different result. Therefore, Ko's omission from his schedules of any equitable interest in Pathway was not a false statement under oath.

### Ko Knew That the Two Statements Were False

Ko knew that he had an interest in the National City bank account. Ko also knew that he was not the owner-occupier of 6028 North Landers, both when he purchased the property and when he refinanced it.

[20]

### Ko Made One of the False Statements With Fraudulent Intent

In many cases, direct evidence of fraudulent intent is unavailable. Therefore, fraudulent intent may be inferred from circumstantial evidence. In the Seventh Circuit, the factors known as "badges of fraud" from which fraudulent intent may be inferred include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

Village of San Jose v. McWilliams, 284 F.3d 785, 791 (7th Cir. 2002) (quotation omitted). If even one of these factors is satisfied, a presumption of fraudulent intent arises. This shifts the burden to the debtor to rebut that presumption. Cantwell & Cantwell v. Vicario, 464 B.R. 776, 791 (N.D. Ill. 2011) (citation omitted).

Some of the badges of fraud have no application here. However, the court has reviewed Ko's course of conduct and the general chronology of the events and transactions under inquiry. Ko has a history of making false statements. He pled guilty to one count of obstruction to justice for lying to the Securities and Exchange Commission in 2000 during its investigation of Cho. He quitclaimed an interest in real estate to his wife during a time when he was under federal investigation. He represented to a mortgage lender three times that he was the owner-occupier at a property into which he had no intention of moving. For these reasons, a presumption of fraudulent intent arises with respect to Ko's false statements. It is Ko's burden to rebut the presumption.

Regarding his omission of the National City bank account, the court finds that Ko rebutted the presumption that he made this omission with fraudulent intent. Despite Ko's history

of false statements, the court found Ko's testimony regarding his mother's National City account

to be very credible.  Although his name was on the account, this was done in order for him to

facilitate her access to funds from her Social Security checks.  Since Ko rebutted the

presumption of fraudulent intent, the burden of proving that Ko omitted this account with intent

to deceive rests on Wolters, and the court finds that Wolters failed to meet this burden.

As for the statement that he would occupy the Landers property, Ko admitted that in

hindsight this was a mistake.  That testimony begs the question of what he thought about the

statement at the time he made it.  Ko purchased the property to help Cho, and the court concludes

from the evidence presented that Ko signed whatever documents were required to accomplish

this end.  Ko has failed to rebut the presumption that he made this statement with fraudulent

intent.

### The Statement Regarding Ko's Status as an Owner-Occupier of 6028 North Landers Did Not Relate Materially to the Bankruptcy Case

The statements Ko made at the purchase of and at each refinancing of 6028 North

Landers, that he was the owner-occupier, were made under oath (for purposes of this decision),

were false and Ko knew they were false.  The burden shifted to Ko to prove that the statements

were not made with an intent to deceive, and he failed to rebut that presumption.  However, in

order for a false statement to rise to the level of requiring denial of discharge, one last crucial

element must be met.  The statement must relate materially to the bankruptcy case.  This is no

judicially-created gloss on the statute – the law specifically states that the false oath must be

made "in or in connection with the case."

No matter what false oaths Ko made with regard to the purchase and refinancing of 6028

North Landers, whether or not the warranty deed was a forgery and Ko obtained the property by

fraud, those false statements had no connection whatsoever with Ko's bankruptcy case.  As a

result, Wolters has not proven by a preponderance of the evidence that Ko's statements in connection with the purchase, refinancing, lease or sale of 6028 North Landers require denial of his discharge under § 727(a)(4).

As this was the only remaining statement that could have supported denial of discharge under § 727(a)(4), the court will enter judgment for Ko on this count.

## CONCLUSION

This matter came before the court following trial on Wolters' complaint seeking a finding that the debt Ko owes to Wolters is nondischargeable under § 523(a)(2), and that Ko's discharge should be denied pursuant to §§ 727(a)(3) and 727(a)(4)(A).  For all of the reasons stated above, judgment is entered for Ko on all counts of the complaint.

Date: _____NOV 2 9 2012_____         _____
                                                             PAMELA S. HOLLIS
                                                             United States Bankruptcy Judge